Mazen Al NAJJAR, Petitioner,

v.

Janet RENO, Attorney General, United States Department of Justice; Doris Meissner, Commissioner Immigration and Naturalization Service; Paul Schmidt, Chairman, Board of Immigration Appeals; Robert Wallis, District Director, Miami District of the INS; and S. Kent Dodd, Warden, Manatee County Downtown Facility, Respondents.

No. 99–3458–CIV.

United States District Court,
S.D. Florida.

May 31, 2000.

1330

**1332**

David Cole, Washington, DC, Martin B. Schwartz, Tampa, FL, Joseph C. Hohenstein, Philadelphia, PA, Nancy Chang, New York City, Andrew H. Kayton, Miami, FL, for petitioner.

Michael Lindemann, Ethan Kanter, U.S. Department of Justice, Office of Immigration Litigation, Civil Division, Washington, DC, Dexter Lee, U.S. Attorney's Office, Miami, FL, for respondents.

*ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR WRIT OF HABEAS CORPUS, DENYING MOTION TO DISMISS, DENYING MOTION TO STRIKE AND CLOSING THIS CASE*

LENARD, District Judge.

**THIS CAUSE** is before the Court on the Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, filed December 22, 1999, and Respondents' Answer and Motion to Dismiss the Petition, filed February 1, 2000. The parties appeared before the Court for oral argument on April 18, 2000. Having reviewed the Petition, the Government's Answer and Motion, and the public record in this case,[1] having heard the oral arguments of the parties, and having been otherwise advised in the premises, for the reasons set forth below, the Court denies the Motion to

Dismiss and grants the Petition to the extent that: (1) the bond redetermination decisions of the Immigration Judge, dated June 23, 1997, and of the Bureau of Immigration Affairs, dated September 15, 1998, are vacated; and (2) this matter is remanded to the Immigration and Naturalization Service for further proceedings consistent with this Order.

## I. Factual Background

Petitioner Mazen Al Najjar is a forty-three year-old Palestinian native of Gaza. He holds an expired Palestinian travel document issued by the Egyptian government. He first entered the United States in 1981 as a non-immigrant graduate student and began studying at North Carolina Agricultural and Technical State University in Greensboro, North Carolina, from which he received a Master's Degree in Industrial Engineering in 1984. He last entered the United States on December 8, 1984, with authorization to remain for the duration of the period of his non-immigrant graduate student status.

### A. April 1985 Order to Show Cause

Petitioner's former spouse, Jan Fairbetter, filed a petition for adjustment of status on his behalf with the Immigration and Naturalization Service ("INS"). (*See* Resp. Answer and Motion to Dismiss ("Resp.Answer") Ex. 2 at 3.)[2] That petition was denied, and on April 19, 1985, the INS issued an order to show cause alleging that Petitioner was deportable pursuant to section 241(a)(9) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1251(a)(9),[3] for failure to maintain and comply with the non-immigrant status under which he had been admitted. With the order to show cause, the INS provided: (1) notice to Petitioner that a hearing on his deportability would be held before an IJ

---

1. This Court has not reviewed the classified evidence submitted by Respondents.

2. The date of filing of this petition is not clear from the record.

3. As the BIA noted, subsequent to the issuance of the order to show cause against Petitioner, this provision was redesignated as INA § 241(a)(1)(C), 8 U.S.C. § 1251(a)(1)(C). (*See* Petition Ex. H. at 1.)

on June 4, 1986; and (2) a warrant for his arrest. On June 4, 1986, Petitioner failed to appear at the hearing, and the Immigration Judge ("IJ") administratively closed Petitioner's case. Petitioner maintains that he did not appear at the hearing because he did not receive notice of the scheduled hearing until June 6, 1986, and that on June 18, 1986 he filed a request to re-open the proceedings, to which the INS did not respond.

On June 21, 1993, World and Islam Studies Enterprise ("WISE"), an organization affiliated with the University of South Florida, submitted to the INS an "Immigrant Petition for Alien Worker" requesting a change of Petitioner's status as an alien worker. (*See* Resp. Answer Ex. 2 at 1.) This petition stated that, as Chief Executive Officer of WISE, Petitioner "[o]versees and directs all research, publishing and educational activities of the institution [and][d]irects all fund-raising and financial aspects of the non-profit corporation," for which he received an annual salary of $ 32,400.00. (*Id.* at 2.) In 1993, the INS granted this petition and reclassified Petitioner as a "member of professions with advanced degree or of exceptional ability," pursuant to 8 C.F.R. § 203(b)(2) (1992). (*Id.* at 1.)

### B. February 1996 Deportation Hearing

The INS eventually re-calendared Petitioner's case for a deportation hearing on February 8, 1996. At this hearing, Petitioner conceded his deportability on the ground that he had overstayed his non-immigrant student visa in violation of INA § 241(a)(9) and sought discretionary relief from deportation, including suspension of deportation, asylum and withholding of removal. On May 13, 1997, IJ J. Daniel Dowell issued a written decision and order, (the "IJ's Deportation Decision") (Petition Ex. C), finding Petitioner deportable

as charged and denying his applications for discretionary relief. At the time, Petitioner maintained that he was stateless, declined to designate a country of deportation, and did not request voluntary departure. The IJ therefore designated United Arab Emirates as Petitioner's country of deportation. Petitioner filed an appeal of the IJ's Deportation Decision with the Board of Immigration Appeals ("BIA").

### C. Petitioner Is Taken into INS Custody.

On May 19, 1997, pending the appeal to the BIA, the INS District Director took Petitioner into custody and detained him without bond. Petitioner requested a re-determination of his custody status pursuant to 8 C.F.R. § 242.2(d) (1995). On May 28, 1997, the INS served Petitioner with a notice of its intent to present classified information in an *in camera* proceeding in support of its custody determination. (*See* Petition Ex. E at 1.) On May 29, 1997, IJ R. Kevin McHugh held a bond redetermination hearing at which Petitioner presented several witnesses and evidence of his employment history and strong community and family ties. Federal Bureau of Investigations Special Agent West also testified at the hearing that Petitioner was a member of WISE, an organization known to support the Palestinian Islamic Jihad ("PIJ"),[4] and that there was an on-going multi-agency investigation into Petitioner's involvement in visa fraud, voter fraud, support to known terrorist organizations, and a sham marriage. On the same day, the IJ held an *ex parte in camera* hearing to receive classified information from the INS regarding Petitioner's connection with the PIJ. Neither Petitioner nor his counsel were present at this hearing and no record of the *in camera* proceeding was made. On June 2, 1997, the IJ provided Petitioner with an unclassified summary of the classified information, which stated: "This Court was provided with information as to

---

**4.** It is undisputed that the PIJ is a "foreign terrorist organization" which the Secretary of State has found "engages in terrorist activity" that "threatens the security of United States

national or the national security of the United States." *See* Designation of Foreign Terrorist Organizations, 62 Fed.Reg. 52,650 (1997), 64 Fed.Reg. 55,112 (1999).

the association of [Petitioner] with the Palestinian Islamic Jihad." (*See* Petition Ex. F at 1.)

On June 6, 1997, the IJ re-opened the public portion of the bond redetermination hearing, and Petitioner presented witnesses in rebuttal to the unclassified summary of the classified information. Dr. Louis Cantori testified that he was an advisory editor of a journal for which Petitioner was the managing editor and that he (Dr. Cantori) had attended two conferences sponsored by WISE. Dr. Cantori further testified that he would be "shocked" if he learned that Petitioner was associated with the PIJ. Former United States Attorney General Ramsey Clark also testified on Petitioner's behalf. Based on his experience as Attorney General from 1960 to 1969, Clark expressed concerns about the reliability of classified information and stated that corroboration of such evidence was often difficult.

On June 23, 1997, IJ McHugh issued a memorandum decision (the "IJ's Bond Redetermination Decision") (Petition Ex. A), in which he found that Petitioner did not have a history of non-appearance at court proceedings, and that Petitioner was "a well respected man, socially, religiously, and professionally [with] strong community and family ties." (*Id.* at 6.) The IJ further found that the classified information was pertinent and reliable on the issue of Petitioner's threat to national security. Based on this classified information, the IJ found that Petitioner was a threat to national security, "[s]pecifically, because of his association with the Palestinian Islamic Jihad terrorist organization." (*Id.*) Accordingly, the IJ held that Petitioner would continue to be detained without bond.

### D. Petitioner Appeals IJ's Bond Redetermination Decision to BIA.

Petitioner appealed this decision to the BIA, on the grounds that: (a) the intro- duction of classified evidence in an *ex parte in camera* proceeding was not expressly authorized by the INA or regulations; (b) the IJ's reliance on the classified evidence deprived him of his liberty without due process of law in violation of the Fifth Amendment; and (c) the IJ's reliance on the classified evidence in finding him a threat to national security violated his First Amendment right to freedom of association. (*See* Petition Ex. B at 4–5.) The INS argued that the IJ's *ex parte in camera* consideration of the classified evidence was within the IJ's discretion, that the bond proceedings complied with due process, and that the evidence supported the IJ's determination that Petitioner presented a threat to the national security.

Addressing the fundamental fairness of the bond proceedings in its September 15, 1998 Decision (the "BIA Bond Redetermination Decision") (Petition Ex. B), the BIA found that "in view of the government's compelling need to shield important, classified national security information bearing on this matter, the Immigration Judge's examination of the *ex parte* evidence *in camera* was proper and constitutionally sound," and that the IJ had conducted the bond proceedings in a "fundamentally fair manner." (*Id.* at 7, 13.) After examining the classified evidence itself, the BIA further concluded that the record reflected that Petitioner was "associated" with the PIJ and that his release from custody "would pose a threat to both: (1) the national security of this country . . . and (2) the safety of other persons or property. . . ." (*Id.* at 13.) Therefore, the BIA affirmed the IJ's decision denying Petitioner's request for release on bond. (*Id.*)[5]

### E. BIA Upholds Deportation Order.

On October 26, 1999, a separate panel of the BIA upheld the IJ's Deportation Deci-

---

**5.** The BIA declined to address Petitioner's First Amendment challenge to his detention on the grounds that it lacked jurisdiction to consider a purely constitutional claim. (*See* BIA Bond Redetermination Decision, at 7.)

sion, (the "BIA's Deportation Decision") (*see* Petition Ex. H at 4), thus rendering Petitioner subject to a "final order of deportation." *See* 8 U.S.C.A. § 1101(a)(47)(B)(i) (providing that order of deportation becomes final on a determination by the BIA affirming such order).[6] Petitioner thereafter filed with the Court of Appeals for the Eleventh Circuit a petition for review of the final order of deportation.[7] To date, that petition remains pending.

## II. Procedural History

On December 22, 1999, Petitioner filed the instant Verified Petition for Habeas Corpus and Complaint for Declaratory and Injunctive Relief (the "Petition"), seeking immediate release pending the outcome of the deportation proceedings. Petitioner challenges his detention without bond on statutory and constitutional grounds. Petitioner's statutory arguments are that: (1) the INA precludes his detention based on evidence which he has not had an opportunity to examine or confront; and (2) the INA does not authorize his continued detention based on evidence of his "association" with the PIJ, which is insufficient to establish that he is a threat to national security. On constitutional grounds, Petitioner argues that his detention based on classified information deprived him of his rights under the Due Process Clause of the Fifth Amendment, insofar as: (1) he was denied notice and a meaningful opportunity to defend himself; (2) he was denied meaningful appellate review due to the IJ's failure to maintain a record of the *in camera* hearing; and (3) the IJ's reliance on hearsay was fundamentally unfair. Petitioner also argues that his detention based on classified evidence of his political association violates his rights under the First Amendment.

On January 31, 2000, Respondents filed an Answer and Motion to Dismiss the Petition. Respondents argue that the Fifth Circuit's decision in *United States ex rel. Barbour v. District Director,* 491 F.2d 573 (5th Cir.1974), *cert. denied,* 419 U.S. 873, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), controls this case.[8] *Barbour* held that it was within the discretion of the Attorney General to consider classified evidence *ex parte* and *in camera* in denying release on bond to an alien pending resolution of his deportation proceedings. *Id.* at 578. As to Petitioner's Due Process claims, Respondents contend that Petitioner lacks a protected liberty interest in release from detention on bond, and that, even assuming the existence of such an interest, he has received due process under the circumstances of this case. Finally, Respondents assert that the denial of discretionary relief, such as release from detention during the pendency of deportation proceedings, to a deportable alien does not violate the First Amendment.

Thereafter, Petitioner submitted an Opposition to the Motion to Dismiss and Reply in Support of his Petition, and Respondents filed a Reply in further support of their Motion to Dismiss. On April 18, 2000, the parties appeared before the Court for oral argument on the legal issues set forth in the Petition.

Contemporaneous with their Answer, Respondents filed a Notice of Classified Submission, notifying Petitioner that they had provided this Court with the classified information that the IJ and BIA had reviewed in the bond redetermination. Respondents argue that *Barbour,* in which both the district court and the court of

---

6. The BIA noted that it did not consider any classified information in deciding Petitioner's appeal of the IJ's Deportation Decision. (*See* Petition Ex. H at 1.)

7. The petition for review of the final order of deportation is proceeding as Case No. 99–14807–CC (11th Cir.1999).

8. Cases decided by Fifth Circuit prior to close of business on September 30, 1981 are binding precedent on the courts of the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

appeals reviewed the classified evidence, provides "the guideline" for reviewing bond redetermination decisions in the Eleventh Circuit and authorizes, but does not require, this Court to review the classified submission. At oral argument, however, Respondents suggested that the Court, without reviewing the classified information, may sustain the BIA's decision upon a conclusion that the record evidence provides a facially legitimate and bona fide reason for denying Petitioner's release on bond.

Petitioner argues against the Court's review of the classified information and suggests that the Court should review the submission only upon a determination that the Court is "unable to rule in [Petitioner's] favor without looking" at the classified information.

The Court has considered the parties' positions, and has concluded that *Barbour* authorizes the Court to review the classified information, although it does not mandate such review. *See Barbour*, 491 F.2d at 576. Insofar as the Court has been able to determine the legal issues in this matter without reviewing the submission and is remanding the matter to the INS for further proceedings, the Court finds review of the classified information unnecessary and, accordingly, has not reviewed the classified information submitted by Respondents.

## III. Jurisdiction

■ The INA was enacted by Congress to govern the immigration and naturalization of aliens. *See* H.R.Rep. No. 82–1365, *reprinted in* 1952 U.S.C.C.A.N. 1653 (1952). Since the INS commenced deportation proceedings against Petitioner, Congress has twice amended the INA. After examining the INA and its amendments, the Court must determine: (1) which statute governs this case based on both the date that Petitioner's deportation proceedings commenced and the date on which his bond redetermination hearing occurred; and accordingly, (2) whether this Court has jurisdiction over the Petition notwith-

standing the amendments to the INA. Based on its review of the factual and procedural history in this case and the effective dates of the amendments to the INA, the Court finds the INA, as it existed prior to the amendments confers jurisdiction on this Court to hear the Petition.

### A. INA

The INA provided for judicial review of orders of deportation and exclusion as follows:

(a) Exclusiveness of procedure

The procedure prescribed by, and all the provisions of chapter 158 of Title 28 shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under section 1252(b) of this title or comparable provisions of any prior Act, except that—

\*\*\*

(10) Habeas corpus

any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

INA § 106a, 8 U.S.C.A. § 1105a(a) (West 1994). The Supreme Court interpreted this provision to vest exclusive jurisdiction in the federal courts of appeals to hear challenges to all determinations made by an immigration judge during and incident to a deportation hearing and reviewable by the BIA. *See Foti v. I.N.S.*, 375 U.S. 217, 229, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). As the Supreme Court and the Eleventh Circuit have recognized, however, the INA did not commit to the exclusive jurisdiction of the court of appeals all challenges to actions of the INS. *See Cheng Fan Kwok v. I.N.S.*, 392 U.S. 206, 216, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968) (holding that "judicial review provisions of § 106(a) embrace

only those determinations made during a proceeding conducted under § 242(b)"); *Jean v. Nelson,* 727 F.2d F.2d 957, 980 (11th Cir.1984), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (holding that INA § 106(a) did not preclude district court jurisdiction over constitutional challenges to actions of INS not involving determination of merits of individual deportation proceedings). Therefore, under the INA, an alien could challenge conduct of the INS other than "final orders of deportation" through a petition for habeas corpus pursuant to 28 U.S.C.A. § 2241 (West 1994). *See Orozco v. United States,* 911 F.2d 539, 540 (11th Cir.1990) (holding that alien may challenge immigration proceedings other than "final orders of deportation" in habeas corpus petition).

Section 2241 provides the federal courts, including the district courts, with the authority to grant a writ of habeas corpus to a person, *inter alia:* "(1) in custody under or by color of the authority of the United States ...; (3) in custody in violation of the Constitution or laws or treaties of the United States...." 28 U.S.C.A. § 2241(c)(1, 3). Therefore, this Court may exercise jurisdiction over the Petitioner's challenge to the IJ's bond redetermination decision, provided that decision does not fall within the definition of a "final order of deportation." *See Cheng Fan Kwok,* 392 U.S. at 216, 88 S.Ct. 1970 (holding that decision of district director, not made in deportation proceeding, to deny stay of deportation, fell outside scope of exclusive court of appeals jurisdiction under INA § 106(a)).

### 1. INA Custody and Bond Provisions

To determine whether the IJ's bond redetermination decision constituted a "final order of deportation," the Court first looks to the statutory basis for the IJ's decision under the INA. INA § 242(a), codified at 8 U.S.C.A. § 1252(a) (West 1994), governs custody, bond and parole decisions made pending the final determination of an alien's deportability. INA § 242(a)(1) provides:

> Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody.... [A]ny such alien taken into custody may, in the discretion of the Attorney General and pending such final determination of deportability, (A) be continued in custody; or (B) be released under bond in the amount of not less than $ 500 with security approved by the Attorney General, containing such conditions as the Attorney General may prescribe; or (C) be released on conditional parole....

INA § 242(a)(1), 8 U.S.C.A. § 1252(a)(1). The procedures for determining deportability were set out separately in INA § 242(b), codified at 8 U.S.C.A. § 1252(b).

Under the INA, a non-criminal alien was not ordinarily detained unless he posed a risk of flight or a threat to the national security of the United States. *See Reno v. Flores,* 507 U.S. 292, 295, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) ("An alien generally ... should not be detained or required to post bond except on a finding that he is a threat to the national security ... or that he is a poor bail risk.") (*quoting Matter of Patel,* 15 I & N Dec. 666, 667 (BIA 1976)); *Carlson v. Landon,* 342 U.S. 524, 540–42, 72 S.Ct. 525, 96 L.Ed. 547 (1952) (affirming detention without bond upon "reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government"); *Doherty v. Thornburgh,* 943 F.2d 204, 210 (2d Cir. 1991) (finding detention of deportable alien without bond based on "general threat to national security" was proper); *Matter of Ellis,* 20 I & N Dec. 641, 642 (BIA 1993) ("An alien, whom the Service in its discretion has arrested and taken into custody generally should not be detained or required to post bond pending the determination of deportability except on a finding

that he is a threat to national security or is a poor bail risk.").

The regulations applicable at the time Petitioner's deportation proceedings commenced permitted the INS, acting through the District Director or other designated official, to arrest an alien and take him into custody pursuant to a warrant of arrest upon the issuance of the order to show cause or at any time thereafter until the alien was subject to a warrant of deportation. *See* 8 C.F.R. § 242.2(c)(1) (1995). The INS notified the alien of this initial custody determination—by checking a box to indicate whether the alien would be detained, released on recognizance, or released under bond—in the same documentation informing him of the commencement of deportation proceedings and the scheduled deportation hearing date and location. *See generally Flores,* 507 U.S. at 307, 113 S.Ct. 1439 (detailing INS procedures for detaining aliens pursuant to INA § 242(a), 8 U.S.C.A. § 1252(a)).

Thereafter, the alien could apply to an IJ for redetermination of his custody status or the terms and conditions of his release. *See* 8 C.F.R. §§ 3.19(a), 242.2(d) (1995). Although the IJ's redetermination decision could "be based upon any information that is available to the Immigration Judge or that is presented to him or her by the alien or the Service," the IJ's consideration of an alien's request regarding custody or bond was to "be separate and apart from, and ... form no part of, any deportation or removal hearing or proceeding." 8 C.F.R. § 3.19(d) (1995); *see also Matter of Chirinos,* 16 I & N Dec. 276, 277 (BIA 1977) (holding that bond redetermination must be conducted separately from deportation hearings because "[t]he requirement of a separate bond procedure and record is part of the effort to divorce, so far as possible, the bond matter from the deportation hearing"). An alien

was entitled to appeal the IJ's redetermination to the BIA. *See* 8 C.F.R. §§ 3.1(b)(7), 3.38 (1995). Neither the INA nor the regulations expressly discuss the use of classified information in a bond redetermination proceeding.

### 2. Judicial Review of Bond Redetermination Decisions

Although the Eleventh Circuit has not addressed the question of whether INA § 106 barred district court jurisdiction over a habeas corpus petition challenging a bond redetermination decision, the court has recognized that, in some circumstances, challenges to INS detention are cognizable under section 2241 habeas corpus petitions. *See Orozco,* 911 F.2d at 541 (*citing Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 498, 93 S.Ct. 1123, 35 L.Ed.2d 443 (1973)). In addition, the Seventh Circuit has held that bond determinations were not "final orders of deportation" committed to the exclusive jurisdiction of the court of appeals under INA § 106(a). *See Gornicka v. I.N.S.,* 681 F.2d 501, 505 (7th Cir.1982). As with the regulations governing Petitioner's bond redetermination, the regulations applicable in *Gornicka* required bond or custody proceedings to be conducted separately from all deportation proceedings. *See id.* (*citing* 8 C.F.R. § 242.2(b) (1982)).[9] In view of this regulation, the court held that it was

> clear that bond hearings are separate and apart from deportation hearings. The considerations taken into account in a bond hearing do not form a part of the record in the deportation proceeding. Whether or not bond is required has no bearing on whether a final order of deportation will be entered. A bond determination is not a final order of deportation, is not made during an administrative proceeding under 1252(b), and

9. This regulation provided: "Consideration under this paragraph by the immigration judge of an application or request of an alien regarding custody or bond shall be separate and apart from any deportation hearing or proceeding, and shall form no part of such hearing or proceeding or of the record thereof." 8 C.F.R. § 242.2 (1982).

does not effect the deportation proceeding.

681 F.2d at 505. The court therefore concluded that it did not have jurisdiction over the petition pursuant to INA § 106(a), and noted that habeas corpus proceedings in the district court would permit "more immediate review" than appeals under INA § 106(a). *Id.* at 506.

Here, IJ McHugh held proceedings to determine Petitioner's custody status on May 29, 1997 and June 6, 1997, which, pursuant to INA § 242, were separate from Petitioner's deportation hearing before IJ Dowell on February 8, 1996. (*See* Petition Ex. A, C.) A panel of the BIA affirmed the IJ's Bond Redetermination Decision on September 15, 1998. On October 26, 1999, a separate panel of the BIA upheld the IJ's Deportation Order. (*See* Petition Ex. B, H.) Therefore, the Court finds that Petitioner's bond redetermination proceedings occurred separately from and formed no part of Petitioner's deportation proceedings. Accordingly, the Court finds that the IJ's Bond Redetermination Decision was not a "final order of deportation" and therefore, INA § 106, 8 U.S.C.A. § 1105a, does not bar this Court's jurisdiction over the petition for writ of habeas corpus under section 2241(c). *See Gornicka,* 681 F.2d at 506.

### B. AEDPA

The Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), was enacted as an amendment to the INA on April 24, 1996. Among the changes to the INA, AEDPA amended the scope of the federal courts' habeas corpus jurisdiction in the immigration context and established the Alien Terrorist Removal Court. The Court next analyzes what effect, if any, these amendments have on Petitioner's status or his bond redetermination procedures, and concludes that it retains jurisdiction over the Petition.

### 1. Habeas Corpus Jurisdiction

AEDPA § 401(e) and (f) deleted the INA's provision for habeas corpus review, previously set forth in INA § 106(a)(10), 8 U.S.C.A. § 1105a(a)(10), and replaced it with AEDPA § 440(a), to read:

> Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(i), shall not be be subject to review by any court.

INA § 106(a)(10), 8 U.S.C.A. § 1105a(a)(10) (West Supp.1997). Effective April 24, 1996, AEDPA applied to "all aliens without regard to the date of entry or attempted entry into the United States." AEDPA § 401(f), *reprinted at* note following 8 U.S.C.A. § 1105a; *see Boston–Bollers v. I.N.S.,* 106 F.3d 352, 354 (11th Cir.1997) (finding that because AEDPA § 440 did not contain an effective date, it became effective on the date signed into law by President Clinton). Six months later, Congress amended AEDPA to retain the original language of INA § 106(a)(10) and merely inserted the new language of AEDPA § 440(a) after the grant of habeas review. *See* Omnibus Consolidated Appropriations Act of 1997 ("OCAA"), Pub.L. No. 104–208 § 671(c)(4), 110 Stat. 3009–1859 (1996). This amendment became effective on April 1, 1997. *See Ramirez–Centeno v. Wallis,* 957 F.Supp. 1267, 1269 (S.D.Fla.1997).

By their terms, however, AEDPA's amendments to habeas corpus jurisdiction (as subsequently corrected by OCAA) do not bar this Court's jurisdiction over the petition in this case. First, AEDPA § 440(a) referred only to final orders of deportation as a result of criminal activity. *See Ramirez–Centeno,* 957 F.Supp. at 1270 (finding that amended language of INA § 106(a)(10) referred only to deportation as result of criminal activity). Petitioner's deportability arises from his failure to maintain and comply with the non-immigrant status under which he had been

admitted. (*See* IJ's Deporation Decision at 1; BIA's Deportation Decision at 1.) Second, AEDPA § 440(a) refers only to habeas corpus review of final orders of deportation. As explained above, the IJ's Bond Redetermination Decision is not a "final order of deportation" and therefore INA § 106(a)(10), as amended by AEDPA, does not bar this Court's jurisdiction over the petition. Finally, the Supreme Court has expressed its disfavor for repeal of habeas corpus jurisdiction by implication, and has declined to read AEDPA as repealing by implication original habeas corpus jurisdiction under section 2241. *See Felker v. Turpin*, 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996). Thus, the Court finds that AEDPA § 440(a) does not remove this Court's jurisdiction over the petition challenging the bond redetermination decision.

## 2. Alien Terrorist Removal Court

Among the provisions designed to implement Congress' stated purpose to "deter terrorism, provide justice for victims, and provide for an effective death penalty ...," AEDPA established the "Alien Terrorist Removal Procedures," and the "Alien Terrorist Removal Court" ("ATRC"), to determine the deportability of suspected "alien terrorists." AEDPA § 401 *et seq.*, 8 U.S.C.A. § 1531 *et seq.* (West 1999) (emphasis added). These procedures authorized the Attorney General, *inter alia*, to use classified evidence in deportation proceedings involving an alien terrorist. *See* 8 U.S.C.A. § 1534.

**10.** The Court notes that at least as of the date this Petition was filed, the INS apparently had yet to invoke the ATRC procedures against any alien. *See* Susan M. Akram, *Scheherezade Meets Kafka: Two Dozen Sordid Tales of Ideological Exclusion*, 14 Geo.Imm.L.J. 51, 70 (1999).

**11.** Prior to IIRIRA, the INA separated the concepts of exclusion and deportation, applying different procedural rules for each. *Compare* 8 U.S.C.A. § 1226 (West 1994) *with* 8 U.S.C.A. § 1252b (West 1994). IIRIRA then created a unified set of "removal" proceed-

The ATRC procedures are inapplicable here, however, because Petitioner conceded his deportability at his deportation hearing before the IJ on February 8, 1996, prior to AEDPA's enactment. Such a concession constituted "clear and convincing evidence" of Petitioner's deportability and therefore rendered his status as a "deportable" alien undisputed. *See Matter of H–M*, 20 I & N Dec. 683, 685, 1993 WL 315990 (BIA 1993) (finding alien's concession of deportability conclusive such that INS need not present additional evidence); *Matter of Abellana and Donovan*, 14 I & N Dec. 262, 265 (BIA 1973) (same); *see generally Woodby v. Immigration and Naturalization Service*, 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (finding that INS must establish deportability by "clear, unequivocal and convincing evidence"). With Petitioner's deportability established, Respondents had no need to invoke the ATRC provisions in this case. *See* 8 U.S.C.A. § 1534 (establishing hearing "for the purpose of determining whether the alien ... should be removed from the United States on the grounds that the alien is an alien terrorist").[10]

## C. IIRIRA

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 100 Stat. 3009–546 (1996), enacted September 30, 1996, effected further amendments to the INA and AEDPA. Section 309 of IIRIRA sets forth the general rule of applicability that the revised procedures for removing aliens,[11] including judicial review proce-

ings, *see* INA § 240, 8 U.S.C.A. § 1229a(a)(1) (West 1999), defining "removable" to include either "deportable" or "inadmissible" (formerly known as "excludable") aliens, *see* INA § 240(e)(2), 8 U.S.C.A. § 1229a(e)(2) (West 1999), and making the "removal" proceeding the sole and exclusive procedure for determining whether an alien would be admitted to or removed from the United States. *See* INA § 240(a)(3), 8 U.S.C.A. § 1229a(a)(3) (West 1999). *See generally Richardson v. Reno*, 162 F.3d 1338, 1346 (11th Cir.1998), *vacated on jurisdictional grounds*, 526 U.S.

dures, do not apply to aliens who were already in either exclusion or deportation proceedings on IIRIRA's effective date, April 1, 1997. *See Reno v. American–Arab Anti–Discrimination Committee,* 525 U.S. 471, 119 S.Ct. 936, 940, 142 L.Ed.2d 940 (1999); note following 8 U.S.C.A. § 1101 (West 1999). IIRIRA § 309(c)(1) provides:

> (c) Transition for Aliens in Proceedings. (1) General rule that new rules do not apply.—Subject to the preceding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings before the title III–A effective date [April 1, 1997]—(A) the amendments made by this subtitle shall not apply, and (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

IIRIRA § 309(c)(1), *reprinted at* note following 8 U.S.C.A. § 1101. The Supreme Court has interpreted this section to apply to those cases "pending on the effective date of IIRIRA." *American–Arab,* 525 U.S. at 481, 119 S.Ct. at 943. A case is "pending" if the alien is not yet subject to a "final order of deportation." *See Zadvydas v. Underdown,* 185 F.3d 279, 286 (5th Cir.1999) (finding alien subject to final order of deportation was no longer "in proceedings"). An order of deportation becomes final on the earlier of "(i) a determination by the Board of Immigration Appeals affirming such order; or (ii) the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." 8 U.S.C.A. § 1101(a)(47)(B). As set forth above, Petitioner was not subject to a final order of deportation until October 26, 1999, the date on which the BIA upheld the IJ's Deportation Order. Accordingly, he was "in proceedings" on April 1, 1997, and his case is governed by

the general rule that IIRIRA's amendments are inapplicable to him.

The exception to the general rule that IIRIRA's amendments are inapplicable to aliens "in proceedings" on April 1, 1997, however, is IIRIRA's judicial review provision, IIRIRA § 306(a), amending INA § 242, codified at 8 U.S.C.A. § 1252(g) (West 1999). Section 1252(g) provides:

> (g) Exclusive Jurisdiction
> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C.A. § 1252(g). This section applies "without limitation to claims arising from all past, pending, or future exclusion, deportation or removal proceedings." IIRIRA § 306(c)(1), 110 Stat. 3009–1675, *reprinted at* note following 8 U.S.C.A. § 1252; *see American–Arab,* 525 U.S. at 477, 119 S.Ct. at 941. The enactment of this section, however, did not generally prohibit judicial review, but rather limited the availability of judicial review of a narrow class of discretionary executive actions. *See id.,* at 481, 119 S.Ct. at 943 (interpreting section 1252(g) to apply "only to three discrete actions that the Attorney General may take"); *Zadvydas,* 185 F.3d at 285. Thus, section 1252(g) does not remove jurisdiction to review habeas corpus petitions challenging the detention of aliens because "detention, while intimately related to efforts to deport, is not itself a decision to 'execute removal orders' and thus does not implicate section 1252(g) under *Reno.*" *Zadvydas,* 185 F.3d at 285–86; *see also Parra v. Perryman,* 172 F.3d 954, 957 (7th Cir.1999) (finding that section 1252(g) did not foreclose district court's

1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999), *on remand,* 180 F.3d 1311 (11th Cir.

1999).

jurisdiction under section 2241 to hear alien's challenge to detention during deportation proceedings); *Kamara v. Farquharson*, 2 F.Supp.2d 81, 87 (D.Mass.1998) (asserting jurisdiction over habeas corpus petition challenging detention during deportation proceedings).

The Court finds that neither the INA, AEDPA, nor IIRIRA preclude this Court's jurisdiction over a habeas corpus petition challenging a bond redetermination decision as to a deportable alien in deportation proceedings prior to April 1, 1997. Accordingly, this Court has jurisdiction to entertain Petitioner's challenge to his continued detention without bond pending resolution of his deportation proceedings. *See American–Arab*, 525 U.S. at 481, 119 S.Ct. at 943 (holding that, as to cases pending on IIRIRA's effective date, section 1252(g) only limited judicial review of Attorney General's decision or action to commence proceedings, adjudicate cases or execute removal orders); *Tefel v. Reno*, 180 F.3d 1286, 1296 (11th Cir.1999) (holding that district court had jurisdiction over claims that pre-IIRIRA INA did not exclusively commit to court of appeals' jurisdiction); *Orozco*, 911 F.2d at 540 (holding that INA did not preclude court's jurisdiction over alien's habeas corpus challenge to detention during deportation proceedings); *Haitian Refugee Center v. Smith*, 676 F.2d 1023, 1033 (5th Cir. Unit B 1982) (holding that INA did not preclude district court's jurisdiction over procedural due process challenge to asylum procedures).

### IV. Standard of Review

The issue before this Court is whether Petitioner has been denied the right to a fundamentally fair bond redetermination hearing pending the final determination of his deportation proceeding. The nature of the habeas corpus petition *sub judice* requires the Court to inquire whether Petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2241(c)(3). Therefore, the Court must assess whether

the IJ acted within his statutory and constitutional authority: (1) in introducing and relying on classified information in Petitioner's bond redetermination; and (2) in determining that Petitioner was a threat to national security based on his "association" with the PIJ.

■ The standard by which the Court determines whether the IJ's conduct was within statutory authority is distinct from the standard for determining whether that conduct was within constitutional authority. *See Heikkila v. Barber*, 345 U.S. 229, 236, 73 S.Ct. 603, 97 L.Ed. 972 (1953) (differentiating constitutional and statutory standards of review). Thus, the Court shall delineate separately the standards governing review of Petitioner's statutory and constitutional claims.

### A. Statutory Claims

■■ It is well-settled that the Constitution grants the legislative and executive branches of the federal government broad concurrent authority over immigration matters. *See Fong Yue Ting v. United States*, 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); *Jean v. Nelson*, 727 F.2d at 965. Pursuant to the authority granted by Article I, § 8 of the Constitution, "[t]o establish a uniform Rule of Naturalization," Congress enacted the INA, under which Congress delegated authority to the Executive to administer and enforce all laws "relating to the immigration and naturalization of aliens." INA § 103, 8 U.S.C.A. § 1103(a)(1) (West 1994). In addition to this delegated authority, the Executive's plenary authority over foreign relations also provides a source of power for the Executive to act in immigration matters. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (explaining that "executive power to control the foreign affairs of the nation" is additional source of authority in immigration matters); U.S. Const. art. II, § 2. The Attorney General retains primary responsibility for immigration matters in the Executive branch, INA

§ 103, 8 U.S.C.A. § 1103 (West 1994), and "is the beneficiary of broad grants of discretion under the statute." *Jean v. Nelson,* 727 F.2d at 965. Under the INA, the Attorney General may delegate her authority to the INS or other United States officials. INA § 103(a), 8 U.S.C.A. § 1103(a).

Several principles govern the courts' review of the Attorney General's authority on this issue. First, deportation is not punishment. *See American–Arab,* 525 U.S. at 490, 119 S.Ct. at 947 (noting that "deportation is necessary in order to bring an end to an ongoing violation of United States law"); *I.N.S. v. Lopez–Mendoza,* 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) ("The purpose of deportation is not to punish past transgressions, but rather to put an end to a continuing violation of the immigration laws."). Second, detention is "necessarily part of deportation procedure" to prevent aliens arrested for deportation from hurting the United States during the pendency of their deportation proceedings. *Carlson,* 342 U.S. at 537–38, 72 S.Ct. 525. Third, since, "[o]f course purpose to injure could not be imputed generally to all aliens subject to deportation," Congress has vested the Attorney General with the discretion to release an alien from detention on bond or other terms and conditions. *Id.* (*citing United States ex rel. Zapp v. District Director,* 120 F.2d 762, 765 (2d Cir.1941) ("The natural interpretation of the language used, that the alien 'may be released under a bond,' would indicate that the release is discretionary with the Attorney General.")). Because the Attorney General possesses such discretion to grant or deny bail, the Supreme Court has interpreted the INA "not [to] grant bail as a matter of right." *Carlson,* 342 U.S. at 540, 72 S.Ct. 525.

■ Because release from detention during the pendency of deportation proceedings is a determination within the discretion of the Attorney General, that decision "can only be overridden where it is clearly shown that it 'was without a reasonable foundation.'" *Id.* at 540–41, 72 S.Ct. 525 (interpreting INA legislative history as "emphatic in explaining Congress' intention to make the Attorney General's exercise of discretion presumptively correct and unassailable except for abuse."). The alien bears "a heavy burden to establish that the Attorney General has abused [her] discretion." *Barbour,* 491 F.2d at 578.

## B. Constitutional Review

■ The Constitution, in particular the First Amendment and the Due Process Clause of the Fifth Amendment, places limits on the statutory authority of the Executive to detain an alien during the pendency of deportation proceedings. *See Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (finding that procedural due process protections extend even to aliens "whose presence in this country is unlawful"); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (finding that First Amendment protections of freedom of speech and association extend to resident aliens). Although "determination and ruling by the Attorney General with respect to all questions of law [under the INA] shall be controlling," the Attorney General's authority and discretion remain "subject to judicial intervention 'under the paramount law of the Constitution.'" *Carlson,* 342 U.S. at 537, 72 S.Ct. 525 (*citing Fong Yue Ting,* 149 U.S. at 713–15, 13 S.Ct. 1016). While the BIA refrained from addressing the purely constitutional issues Petitioner raised in his appeal of the IJ's Bond Redetermination Decision, (*see* BIA Bond Redetermination Decision at 7), this Court may consider these issues on Petitioner's challenge to the bond redetermination decision by means of a habeas corpus petition filed pursuant to 28 U.S.C.A. § 2241(c)(3). The Court may also review whether the bond redetermination decision was made in violation of the Due Process Clause. *See Carlson,* 342 U.S. at 542, 72

S.Ct. 525; *Orozco,* 911 F.2d at 541 (finding that deportable alien in custody may make statutory and constitutional challenges to detention pursuant to section 2241).

## V. Analysis

The Court now analyzes the pivotal issue of Petitioner's claim: whether, under the INA and the Constitution, Petitioner has been denied the right to a fundamentally fair bond redetermination hearing pending the resolution of his deportation proceedings. The Supreme Court has established a framework for determining the degree of protection the Constitution affords an alien based on: (1) the legal status of the alien; and (2) the context of the challenged government action. *See Landon v. Plasencia,* 459 U.S. 21, 32–37, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Plyler v. Doe,* 457 U.S. 202, 210–16, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *see also Jean v. Nelson,* 727 F.2d at 972 ("[T]hose with the status of deportable aliens are constitutionally entitled to rights in the deportation context that are inapplicable to exclusion proceedings."). Because this framework also provides clarity to the analysis of Petitioner's statutory claims, the Court will first analyze Petitioner's legal status and the nature of the immigration proceeding involved. The Court will then evaluate whether: (1) the INA provides explicit or implicit authority for Petitioner's continued detention without bond based on the introduction and reliance on classified information; (2) the use of classified information violated Petitioner's procedural due process rights; and (3) Petitioner's detention based on his "association" with the PIJ violates either the INA or the First Amendment.

### A. Petitioner's Legal Status and the Nature of the Immigration Proceedings

At the time of his bond redetermination proceedings, Petitioner was "deportable," having conceded his deportability for having failed to maintain the conditions of his student visa. His constitutional status, in the immigration context, is greater than that of an "excludable" alien, *see e.g., Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), and that of an alien subject to a "final order of removal," *see, e.g., Zadvydas,* 185 F.3d at 289, but less than that of a "lawful permanent resident." *See, e.g.,Kwong Hai Chew,* 344 U.S. at 592, 73 S.Ct. 472. *Cf. Wong Wing v. United States,* 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (noting that powers of federal government with regard to aliens are more limited outside the context of regulating exclusion of persons from the United States).

Second, Petitioner challenges not the initial decision to detain him on the issuance of the order to show cause, but rather the IJ's use, subsequently sanctioned by the BIA, of the classified information in redetermining his custody without bond. (*See* Pet.Mem. in Opp'n at 11–12 (asking Court "to assess the legality of the *process* that has been accorded to [Petitioner]").) Petitioner does not allege, nor has the Court seen any evidence, that the initial decision by the INS to detain Petitioner was based on classified information. Accordingly, the Court directs its inquiry and the fashioning of any remedy toward the bond redetermination proceedings before the IJ and the BIA.

Third, Petitioner's challenges arise in the context of bond redetermination proceedings, which are entirely separate from deportation proceedings. *Compare* 8 U.S.C.A. § 1252(a) (providing for arrest and custody and review of determination) *with* 8 U.S.C.A. § 1252(b) (explaining proceedings to determine deportability); *see* 8 C.F.R. § 3.19(d) (1995) ("Consideration by the Immigration Judge of an application or request of [an alien] regarding custody or bond under this section shall be separate and apart from, and shall form no part of, an deportation hearing or proceeding."); *see also Gornicka,* 681 F.2d at 505; Part

III.A.1, *supra.* Accordingly, the Court does not base its ruling on the deportation hearing transcripts submitted by either party.

It is in this landscape that the Court shall determine whether, under the INA prior to AEDPA and IIRIRA and under the Constitution, the IJ and the BIA may determine that a deportable alien shall not be released from custody during the pendency of his deportation proceedings on the basis of classified information relating to his "association" with a foreign terrorist organization.

**B. Petitioner's Continued Detention without Bond Based on Review of Classified Information Does Not Violate the INA.**

Petitioner first argues that the IJ lacked statutory authority to consider classified evidence at his redetermination hearing and consequently to continue to detain him in reliance on that evidence. (*See* Pet. Mem. in Support at 10.) Petitioner does not challenge the Attorney General's discretion, in general, under the INA to continue an alien's custody during deportation proceedings on a properly-made determination that his release would pose a threat to the national security of the United States. *See Carlson,* 342 U.S. at 541–42, 72 S.Ct. 525. Petitioner does challenge, however, the manner in which the IJ made that determination with respect to his custody. (*See* Pet.Mem. in Opp'n at 11.) Specifically, Petitioner argues that the INA provides neither express nor implied authority for the use of classified information in a bond redetermination hearing.

**1. Express Statutory Authority**

As set forth above, INA § 242(a), 8 U.S.C.A. § 1252(a), governs Petitioner's detention and vests the IJ and the BIA, acting on behalf of the Attorney General, with discretion to review an initial custody decision and to determine whether to continue custody or release the alien on bond or conditional parole. *See* INA § 103(a), 8 U.S.C.A. § 1103(a); 8 C.F.R. § 3.1(d) (1995). Congress did not provide in the INA specific statutory standards governing bond determination and did not restrict the considerations which may be relied upon or the procedure by which the discretion should be exercised. *Cf. Jay v. Boyd,* 351 U.S. 345, 354, 76 S.Ct. 919, 100 L.Ed. 1242 (1956) (finding that "Congress did not provide statutory standards for determining who, among qualified applicants for suspension [from deportation], should receive the ultimate relief" but left decision to "sound discretion of the Attorney General").

Notwithstanding this lack of congressional guidance, however, INA § 242(a) has not been interpreted to require detention of all deportable aliens during deportation proceedings, but rather only those deemed to be a threat to national security or a poor bail risk. *See Patel,* 15 I & N Dec. at 667; *see also Flores,* 507 U.S. at 295, 113 S.Ct. 1439 (*citing Patel,* 15 I & N Dec. at 667, as limiting Attorney General's discretion to detain aliens during deportation proceedings); *Carlson,* 342 U.S. at 542, 72 S.Ct. 525 (finding refusal of bail not arbitrary or capricious "where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government"); *Matter of Andrade,* 19 I & N Dec. 276, 277 (BIA 1977) (*citing Patel,* 15 I & N Dec. at 667). When considering a request for redetermination of custody status, the IJ may, pursuant to regulations, base his or her determination on "any information that is available" or that the alien or the INS has presented to him. 8 C.F.R. § 3.19 (1995). Neither the statute nor the regulations, however, mention the use of classified information in making this redetermination. *Compare* 8 C.F.R. § 3.19 (1995) *with* 8 C.F.R. § 244.3 (1952) (providing that BIA may use confidential information in ruling on applications for suspension of deportation upon determination that "disclosure of such information would be prejudicial to the public interest, safety or security")

(*cited in Jay v. Boyd*, 351 U.S. at 347–48, 76 S.Ct. 919). Therefore, the Court finds that INA § 242(a) does not provide express authority for an IJ to introduce and rely on classified information in a bond redetermination proceeding involving a deportable alien.

## 2. Implied Statutory Authority

 In the absence of express authority in the INA for the introduction and use of classified information in Petitioner's bond redetermination proceeding, the Court must determine whether the INA provides implied authority for such use. To make this determination, the Court will: (1) examine the Fifth Circuit's decision in *Barbour*, 491 F.2d 573, which addressed the use of classified information in bond redetermination proceedings; (2) consider Petitioner's statutory construction arguments; and (3) assess whether, if the INA provides implied authority, Respondents acted within the scope of this implied authority with respect to Petitioner's bond redetermination proceedings.

### a. The *Barbour* Decision

The Fifth Circuit addressed whether the INA provides statutory authority to use classified information in a bond redetermination hearing in *Barbour* 491 F.2d at 577–78, a decision which operates as binding authority on this Court.[12] The INS took Barbour, a deportable alien in proceedings but not yet subject to a final order of deportation, into custody and detained him without bond on the grounds that he was a poor bail risk. *Id.* at 575. Barbour appealed this determination to a Special Inquiry Officer, who denied release on bond. *Id.* A second Special Inquiry Officer reconsidered and affirmed Barbour's detention. *Id.* Barbour thereafter appealed to the BIA, and, while the case was under advisement, the INS provided the BIA with correspondence, including classified information, from the State Department recommending that he not be released on bond. *Id.* After reviewing this new information, including the classified information, the BIA held that Barbour's release from custody would endanger the national security of the United States. *Id.*

In his habeas corpus petition, Barbour challenged the BIA's statutory authority to consider classified information in determining custody as well as the constitutional authority to consider classified information *ex parte* without his having an opportunity to refute it. *Id.* at 578. The *Barbour* court reached only the statutory argument, interpreting INA § 242(a) as permitting the Attorney General to grant or deny release on bail "on the basis of confidential information, the disclosure of which would be prejudicial to the public interest, safety or security, if the use of such information is sanctioned by regulations." *Id.* at 578. The regulation applicable to Barbour's bond redetermination provided that the determination of custody status "may be based upon any information" available or presented by the alien or the INS. *Id.* (*quoting* 8 C.F.R. § 242.2(b) (1973)). The court interpreted this regulation to permit the special inquiry officer and the BIA to base the decision as to bond on any information available, including classified information. *See Barbour*, 491 F.2d at 578. After reviewing the classified information itself *in camera*, the Fifth Circuit held that the BIA's review of and reliance on the classified information in making the bond determination was within the statutory authority granted by the INA. *Id.* Therefore, the court concluded that the BIA's determination that Barbour should remain in INS custody on the grounds that he was a national security risk was not an abuse of discretion. *Id.* at 577.

The *Barbour* court thus interpreted INA § 242(a) to provide implied statutory authority for the introduction and use of classified information in a bond redetermi-

---

12. *See supra* note 8.

nation proceeding, predicated on a two-part finding that: (1) the disclosure of the classified information would be "prejudicial to the public interest;" and (2) the regulations "sanction" the use of such information. *Id.* at 578; *cf. Jay v. Boyd,* 351 U.S. at 358, 76 S.Ct. 919 (interpreting INA to permit suspension of deportation decisions based on classified information where regulations limited use of such information to instances where disclosure "would be prejudicial to the public interest, safety, or security").

### b. Petitioner's Statutory Construction Arguments

Petitioner argues against finding an implied authority in the INA to use classified information in bond redetermination proceedings, first citing the " 'settled doctrine that deportation statutes must be construed in favor of the alien.' " (Pet.Mem. in Support at 14 n. 7 (citing, *inter alia, I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), and *Lennon v. I.N.S.,* 527 F.2d 187, 193 (2d Cir.1975)).) In *Jay v. Boyd,* however, the Supreme Court found this argument did not require the Court to depart from the "clear meaning" of the INA to permit the use of classified information in the context of suspension from deportation. 351 U.S. at 357–58 & n. 21, 76 S.Ct. 919. Similarly here, this Court will not depart from the language of the INA and the regulations permitting the IJ to rely on "any information" in a bond redetermination proceeding, subject to the limitations on that authority explained in *Barbour. See Barbour,* 491 F.2d at 578; *see also Jay v. Boyd,* 351 U.S. at 357–58, 76 S.Ct. 919 (construing INA and regulations to permit decision as to suspension of deportation on the basis of classified information "at least when such action would be reasonable").

Petitioner argues further that the absence of express statutory language permitting the use of classified information should be interpreted to preclude such use

in a bond redetermination hearing. (*See* Pet.Mem. in Support at 13 (citing *Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. 1207).) This argument, however, is also foreclosed by *Jay v. Boyd,* 351 U.S. at 359, 76 S.Ct. 919. There, the Supreme Court ruled that although an alien in deportation proceedings enjoys constitutional protections that "may militate against construing an ambiguous statute as authorizing the use of confidential information in deportation proceedings," this rule of construction does not apply to a deportable alien seeking relief that the Attorney General has discretion to grant. *See Jay v. Boyd,* 351 U.S. at 359, 76 S.Ct. 919. Petitioner is also a deportable alien who, although entitled to certain constitutional protections, *see* Part V.C, *infra,* is not entitled to release on bond pending resolution of his deportation proceedings as a matter of right. *See Carlson,* 342 U.S. at 540, 72 S.Ct. 525. Here, the classified information was introduced and relied upon solely at the bond redetermination proceeding. Therefore, the Court finds that the absence of express language in the INA or the regulations did not preclude the introduction of or reliance on classified information. *See Jay v. Boyd,* 351 U.S. at 359, 76 S.Ct. 919 (distinguishing constitutional protections afforded to deportable resident alien from statutory constraints on Attorney General's authority to use classified information).

Finally, Petitioner argues that because other provisions of the INA permit the use of classified evidence in immigration proceedings, the Court should interpret INA § 242(a) to preclude introduction of classified information in bond redetermination proceedings. Petitioner points to: (1) section 1225(c), providing for the use of classified evidence to exclude entering aliens; (2) section 1229a, providing for the use of classified evidence to oppose an alien's application for discretionary relief from a final order of removal; and (3) sections 1531 *et seq.,* providing for the use of and establishing procedures for introducing

classified evidence to determine the deportability of alien terrorists. (*See* Pet. Mem. in Support at 11–12.)

Both section 1225(c) and section 1229a, however, were enacted pursuant to IIRIRA and therefore, as explained above, do not apply to Petitioner's bond redetermination. *See* Part III.C., *supra.* In addition, Congress created the ATRC as part of AEDPA, with the purpose of establishing procedures "to permit the use of classified information in appropriate cases to establish the deportability of an alien terrorist." H.Rep. No. 104–518, *reprinted in* 142 Cong.Rec. H3305–01, H3334 (daily ed. Apr. 15, 1996). These procedures became effective on April 24, 1996, *see* AEDPA § 401(f), after Petitioner conceded his deportability at a hearing before the IJ on February 8, 1996. Petitioner's concession obviated the need for the INS to seek a determination that Petitioner was deportable or subsequently invoke the ATRC procedures as to him. Since the ATRC procedures did not govern Petitioner's deportation proceedings, the Court declines to draw any inference that they effect the interpretation of the statute and regulations governing his bond redetermination. *See* Part III.B.2, *supra.*

Accordingly, the Court finds that the theories of statutory construction advanced by Petitioner do not preclude an interpretation of INA § 242(a) to provide implied authority for the introduction of and reliance on classified information in a bond redetermination proceeding. *See Jay v. Boyd,* 351 U.S. at 358–59, 76 S.Ct. 919 (interpreting INA § 242(a) to permit decisions based on classified information "at least when such action would be reasonable"); *Barbour,* 491 F.2d at 578 (holding that Attorney General may base bond redetermination decision on classified information where disclosure of such information "would be prejudicial to the public interest, safety, or security" and use is "sanctioned by regulations").

### c. Compliance with Implied Statutory Authority Under INA § 242(a)

Having determined that the INA contains implied authority for the use of classified information in bond redetermination proceedings, the Court must now analyze the facts *sub judice.* Here, Respondents have represented to the Court that disclosure of the classified information reviewed by the IJ and BIA in connection with Petitioner's bond redetermination would compromise national security in that the information: (1) would reveal the FBI's investigative interests in certain individuals, organizations or countries; (2) would permit an intelligence or suspected intelligence or terrorist organization, group or individual to avoid detection measures; or (3) would otherwise reveal intelligence agency sources and the methods by which such information is obtained. (*See* Declaration of Michael E. Rolince, dated Feb. 10, 2000 at 3.) Based on this representation as to the classified information, the Court finds that disclosure of the classified information would be "prejudicial to the public interest, safety, or security." *Jay v. Boyd,* 351 U.S. at 358, 76 S.Ct. 919; *Barbour,* 491 F.2d at 578 (interpreting INA and regulations to permit denial of release on bond based on classified information "the disclosure of which would be prejudicial to the public interest, safety, or security").

In addition, the regulation applicable to Petitioner's bond redetermination proceedings, 8 C.F.R. § 3.19(d) (1995), contains language similar to that of the regulation applicable in *Barbour. Compare* 8 C.F.R. § 3.19(d) (1995) ("The determination of the [IJ] as to custody status or bond may be based upon any information that is available to the [IJ] or that is presented to him by the alien or the [INS].") *with* 8 C.F.R. § 242.2(b) (1973) ("The determination of the special inquiry officer as to custody status or bond may be based upon any information which is available to the special inquiry officer, or which is presented to him by the alien or the [INS]."). Based

on the language of the applicable regulations, this Court finds that the IJ's use of classified information in Petitioner's bond redetermination hearing was "sanctioned by regulations." *Barbour,* 491 F.2d at 578. Accordingly, the Court concludes that the introduction of and reliance on classified information in Petitioner's bond redetermination proceedings was within the implied statutory authority granted by INA § 242(a) and 8 C.F.R. § 3.19(d).[13] *See Barbour,* 491 F.2d at 578.

### C. The Use of Classified Evidence in Bond Redetermination Proceeding Violated Petitioner's Procedural Due Process Rights.

Petitioner argues that the IJ's use of classified evidence at his bond redetermination hearing violated his procedural due process rights in that: (1) he has been denied notice of the charges and a meaningful opportunity to defend himself; and (2) he has been deprived of meaningful appellate review and the possibility of declassification due to the IJ's failure to maintain a record of the *in camera* proceeding. (*See* Pet.Mem. in Support at 18.) To analyze Petitioner's procedural due process claim, the Court must first determine whether a constitutionally protected interest exists in the context of a bond redetermination hearing. *See Tefel,* 180 F.3d at 1299 ("The necessary first step in evaluating any procedural due-process claim is determining whether a constitutionally protected interest has been implicated."). Following a finding of a protected liberty interest, the Court must assess the extent of process due. *See Haitian Refugee Center,* 676 F.2d at 1037 ("Once we find that a protected interest is implicated, 'the question remains what process is due.'") (*quoting Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33

L.Ed.2d 484 (1972)). Finally, the Court must fashion an appropriate remedy for any violation of procedural due process under the circumstances. *See Haitian Refugee Center,* 676 F.2d at 1041 (affirming district court's order requiring government to submit "procedurally fair plan for the orderly reprocessing" of aliens' asylum applications).

### 1. Constitutionally Protected Liberty Interest

■ The procedural component of the Due Process Clause of the Fifth Amendment protects against the deprivation of life liberty or property without "due process of law." U.S. Const. amend. V. Although the question of procedural due process protections afforded to a deportable alien in a bond redetermination proceeding is apparently one of first impression in the Eleventh Circuit, it is well-settled that aliens present in the United States, even those present illegally and subsequently determined to be deportable, are entitled to the protections of the Due Process Clause. *See Plyler,* 457 U.S. at 210, 102 S.Ct. 2382; *Haitian Refugee Center,* 676 F.2d at 1036. Notwithstanding the applicability of the Due Process Clause protections generally, the status of an alien as well as his circumstances impact the nature and extent of those protections. *See Jean v. Nelson,* 727 F.2d at 972; *Zadvydas,* 185 F.3d at 289 ("alien status can affect our analysis of constitutional rights"). Therefore, "certain classifications and restrictions that would be intolerable if applied to citizens are allowable when applied to resident aliens." *Zadvydas,* 185 F.3d at 289.

■ The concept of procedural due process "is not itself an independent right, but merely the condition precedent to the

---

13. Although the parties have agreed that pre-IIRIRA law applies to this Petition, the Court notes that the language of the rule governing the IJ's redetermination of custody on the date of Petitioner's bond redetermination hearing is identical to the quoted IIRIRA language here. *See* 8 C.F.R. § 3.19(d) (1998) (permitting IJ to rely on "any information"). Therefore, even if the IJ applied the latter regulations, the Court finds the IJ's decision was within the implied authority granted by the INA.

deprivation of a life, liberty or property interest." *Haitian Refugee Center*, 676 F.2d at 1037. Thus, the Court must first examine whether a "constitutionally protected liberty interest" triggering due process protections exists in the context of a bond redetermination proceeding. *Id.; see also Tefel*, 180 F.3d at 1299 (evaluating whether INS' denial of suspension of deportation gave rise to protectable liberty or property interest). In addition to the "life, liberty, or property" language of the Fifth Amendment, "constitutionally protected liberty or property interests may have their source in positive rules of law, enacted by the state or federal government and creating a substantive entitlement to a particular government benefit." *Haitian Refugee Center*, 676 F.2d at 1038. These liberty interests are inherently tied to the scope of the Executive's authority under the statute or regulation at issue. *See, e.g., Garcia–Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir.1986) (observing that absent rules or limitations constraining official discretion alien "merely has an expectancy reinforced by a system capable of granting or withholding that liberty"). Thus, a constitutionally protected liberty interest will not exist where the Attorney General's discretion is "unfettered" or "an act of grace." *See, e.g., I.N.S. v. Yueh–Shaio Yang*, 519 U.S. 26, 30, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996) (noting Attorney General's "unfettered discretion" to award suspension of deportation); *Tefel*, 180 F.3d at 1301 (finding that, in the absence of any limits on Attorney General's discretion to grant or deny applications, suspension of deportation was an "act of grace").

 Where a statute or regulation circumscribes the Attorney General's discretion, however, a right protected by the Due Process Clause may arise. For example, in *Haitian Refugee Center*, a class of Haitian nationals challenged expedited administrative procedures implemented by the INS to process their applications for political asylum. *See Haitian Refugee Center*, 676 F.2d at 1026. The plaintiffs' complaint did not seek " 'to litigate the merits of any single decision by INS or a particular immigration judge,' " but rather alleged that the INS had " 'instituted a program "to achieve expedited mass deportation of Haitian nationals." ' " *Id.* (quoting *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 457 (S.D.Fla.1980)).

The Fifth Circuit concluded that the statute and the INS regulations establishing an asylum procedure evidenced "a clear intent to grant aliens the right to submit and the opportunity to substantiate their claim for asylum." *Haitian Refugee Center*, 676 F.2d at 1038. The *Haitian Refugee Center* court reached this conclusion notwithstanding the fact that "[t]here is no constitutionally protected right to political asylum itself," and emphasized the "valuable" right to petition and have the petition adjudicated fairly *Id.* at 1039 (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982)) ("[T]he Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged."); *see also Haitian Refugee Center*, 676 F.2d at 1039 n. 37 (comparing right to apply for asylum to "the right of the people to petition the government for redress of grievances. U.S. Const. amend. I. This right likewise carries with it no guarantee of securing the substantive relief sought"). Therefore, the Fifth Circuit held, this right was "sufficient to invoke the guarantee of due process." *Id.*

A similar right, arising out of "positive rules of law," *Haitian Refugee Center*, 676 F.2d at 1038, to apply for redetermination of bond and to have that application fairly judged exists in the context of detention during deportation proceedings. *See* INA § 242(a), 8 U.S.C.A. § 1252(a); 8 C.F.R. §§ 3.19, 242.2(d) (1995). As described in Part III.A.1, *supra*, Congress created in the INA a procedural mechanism by which an alien could seek redetermination of his or her custody status pending the final determination of deportability. *See* INA § 242(a)(1), 8 U.S.C.A. § 1252(a)(1). Pur-

suant to this statutory mandate, the INS, in turn, promulgated regulations delineating the bond redetermination procedures, which permitted aliens to apply to an IJ for redetermination and to appeal the IJ's decision to the BIA. *See* 8 C.F.R. §§ 3.1(b)(7), 3.19, 242.2(d) (1995).

In addition to these statutory and regulatory procedures, the Supreme Court has recognized the inherent limitations on the Attorney General's discretion to continue to detain an alien during deportation proceedings. *See Flores,* 507 U.S. at 295, 113 S.Ct. 1439 (citing *Patel,* 15 I & N Dec. 666). These limitations circumscribe the Attorney General's discretion to continue to detain an alien who is neither a threat to national security nor a risk of flight. *See Patel,* 15 I & N Dec. at 667 (the *"Patel* factors"). The *Patel* factors, although not expressly stated in the INA or regulations, arose from the agency's own interpretation of the statute and regulations and have continued to govern the federal courts' and the BIA's review of bond redetermination decisions. *See Haddam v. Reno,* 54 F.Supp.2d 602, 610 (E.D.Va.1999) (finding that excludable alien who posed national security threat and risk of flight was properly detained during asylum proceedings); *Kamara v. Farquharson,* 2 F.Supp.2d 81, 88 (D.Mass.1998) (finding deportable alien properly detained on basis of *Patel* factors); *Moskalev v. District Director,* No. 95–11218–RGS, 1996 WL 622475 at *3 (D.Mass., Jan.24, 1996) (finding deportable alien properly detained on basis of *Patel* factors); *Matter of Andrade,* 19 I & N Dec. 488 (1987) (citing *Patel* factors).

■ Thus, while a deportable alien may not have a right to release on bond or other conditions during his deportation proceedings, see *Carlson,* 342 U.S. at 540, 72 S.Ct. 525, the circumscriptions on the Attorney General's authority to continue to detain an alien establish a constitutionally protected interest in applying for redetermination and distinguish the type of discretion involved here from situations in which the Attorney General's discretion is "unfettered" or a "matter of grace." *See Haitian Refugee Center,* 676 F.2d at 1039 (finding that, although aliens did not have constitutionally protected right to political asylum itself, right to petition for asylum was "sufficient to invoke the guarantee of due process"); *see also Board of Pardons v. Allen,* 482 U.S. 369, 380–81, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (finding that prisoners did not have right to release on parole, but did have constitutionally protected interest where state parole system contains specific criteria giving rise to expectation of parole); *Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex,* 442 U.S. 1, 14–16, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (evaluating whether state parole system, which afforded prisoners opportunity to be heard and notice of reasons for parole denial, comported with due process). Examples of such unfettered discretion—which the courts have held not to give rise to protected liberty interests—include the Attorney General's decision to grant or deny suspension from deportation, *see, e.g., Yueh–Shaio Yang,* 519 U.S. at 30, 117 S.Ct. 350; *Tefel,* 180 F.3d at 1301, revoke parole of excludable aliens, *see, e.g., Garcia–Mir,* 788 F.2d at 1450, and grant or deny a motion to re-open deportation proceedings, *see, e.g., Olim v. Wakinekona,* 461 U.S. 238, 248–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Mejia Rodriguez v. Reno,* 178 F.3d 1139, 1145–46 (11th Cir.1999); *Achacoso–Sanchez v. I.N.S.,* 779 F.2d 1260, 1264 (7th Cir.1985).

Therefore, on the basis of the statutory and regulatory procedures governing bond redetermination proceedings, and the limitations on the Attorney General's discretion to continue an alien in custody, the Court finds that Petitioner possesses a constitutionally protected right to apply for the redetermination of his custody status and have that application judged in a fundamentally fair manner, and that this entitlement "is sufficient to invoke the guarantee of due process." *Haitian Refugee Center,* 676 F.2d at 1039.

### 2. What Process Is Due?

 Having determined that Petitioner is entitled to procedural due process in his bond redetermination proceedings, the Court must now "define the particulars of what the government may or may not do in making a decision on that petition." *Haitian Refugee Center*, 676 F.2d at 1039. The cases, on which Respondents rely in support of their use of classified information, sustained the use of such information on statutory grounds and did not specifically address the constitutional limits imposed on that use or the fundamental fairness of the procedures provided in the regulations. *See Jay v. Boyd*, 351 U.S. at 358, 76 S.Ct. 919 (noting that the alien made no constitutional challenge to INA and regulations); *Barbour*, 491 F.2d at 578; *see also Kiareldeen v. Reno*, 71 F.Supp.2d 402, 411 (D.N.J.1999) (noting that *Jay v. Boyd* and *Barbour* did not involve constitutional challenges to the statute and regulations). Although the Court must refrain from imposing constitutional restraints that might impede the government's ability to conduct immigration policy and protect national security, the Court must also ensure that the executive branch conducts bond redetermination proceedings in a fundamentally fair manner. *See Mathews v. Diaz*, 426 U.S. at 81, 96 S.Ct. 1883; *see also Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 163, 2 L.Ed. 60 (1803) (explaining federal courts' obligation to enforce the right of individuals to claim protection of the laws). The Court will next evaluate the constitutional adequacy of Petitioner's bond redetermination proceedings in consideration of the individual and governmental interests at stake. *See Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

In *Mathews v. Eldridge*, the Supreme Court explained the analysis courts must apply in identifying the extent of procedural due process required in a given situation:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 335, 96 S.Ct. 893. In order to strike the proper balance between these interests, the government should "adopt[ ] procedures that reduce the risk of erroneous deprivation without imposing an undue burden on the government." *Walters v. Reno*, 145 F.3d 1032, 1043–44 (9th Cir. 1998). The *Mathews v. Eldridge* analysis applies with equal force to aliens in deportation proceedings. *See Haitian Refugee Center*, 676 F.2d at 1040 (applying *Mathews v. Eldridge* to deportable aliens' challenge to asylum application procedures); *Talamantes–Penalver v. I.N.S.*, 51 F.3d 133 (8th Cir.1995) (applying *Mathews v. Eldridge* to deportable alien's due process challenge to requirements for filing appeal of IJ decision); *Yanez–Popp v. U.S. I.N.S.*, 998 F.2d 231 (4th Cir.1993) (applying *Mathews v. Eldridge* to deportable alien's challenge to denial of motion to reopen proceedings); *see also Richardson v. Reno*, 162 F.3d 1338 (11th Cir.1998), *vacated and remanded on jurisdictional grounds*, 526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1029 (1999). Thus, the Court will next assess: (1) the nature of Petitioner's interest in bond redetermination proceedings; (2) the extent of the risk of erroneous deprivation of Petitioner's interests if classified information is introduced in those proceedings; (3) the potential impact of additional or different procedures; and (4) the nature of the Government's interests.

### a. Petitioner's Interest

Respondents argue that Petitioner possesses no entitlement to release, and that the decision to release him is purely a matter of the Attorney General's discre-

tion, thus precluding his due process challenge under *Tefel v. Reno*, 180 F.3d 1286 (11th Cir.1999). In *Tefel*, a class of deportable aliens who had been placed in deportation proceedings prior to IIRIRA challenged the application of the "stop-time" rule for determining eligibility for suspension of deportation.[14] In reviewing the aliens' request for injunctive relief, the Eleventh Circuit held that "because suspension [of deportation] remains a purely discretionary 'act of grace,'" and there were no "limits on the Attorney General's discretion to grant or deny applications for suspension of deportation," the class of deportable aliens "[did] not enjoy any 'liberty or property' interest attendant to their applications for suspension." 180 F.3d at 1301.

Respondents' reliance on *Tefel* in this matter is misplaced for several reasons. First, the nature of the interest Petitioner asserts is substantially different from that asserted by the *Tefel* plaintiffs. Here, the issue is not whether Petitioner has a right to release on bail pending his deportation proceedings, but rather whether he has been denied his right to a fundamentally fair proceeding to determine his eligibility for such release. *See Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."). Petitioner does not, at this time, contest the *fact* of his continued detention, but rather the *process* by which it has been obtained. (*See* Pet.Mem. in Opp'n at 11.)

In addition, *Tefel*'s conclusion that the relief sought was a "matter of grace"

turned primarily on the absence of any standards or criteria limiting the scope of the Attorney General's discretion to suspend an alien's deportation order. *See* 180 F.3d at 1301. In contrast, at the time of his bond redetermination hearing, Petitioner was entitled to release on bond or other conditions *unless* the IJ determined that he was a threat to national security or a poor bail risk. *See Flores*, 507 U.S. at 295, 113 S.Ct. 1439; *Patel*, 15 I & N Dec. 666. Because these criteria applied to custody determinations, the Attorney General's discretion to release Petitioner from detention was not "unfettered" or purely an "act of grace." *Compare Yueh–Shaio Yang*, 519 U.S. at 30, 117 S.Ct. 350 (noting Attorney General's "unfettered discretion" to award suspension of deportation and observing parallels between suspension and executive pardon).

Finally, as a "deportable" alien at the time of the bond redetermination hearing, Petitioner enjoys greater protections of due process than those afforded to the aliens in *Tefel*, who were subject to final orders of deportation from the United States. *See Tefel*, 180 F.3d at 1290, 1296; *see also Zadvydas*, 185 F.3d at 295 (applying more deferential standard of review to due process claims of alien whose deportability had been properly and finally established).

The Court finds that Petitioner's challenge to the use of and reliance on classified information at his bond redetermination proceedings implicates core interests of the Due Process Clause: (1) the right to petition the government and have that petition fairly adjudged "'at a meaningful time and in a meaningful manner,'" *Haitian Refugee Center*, 676 F.2d at 1039 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62

---

**14.** Specifically, the plaintiffs challenged the application of IIRIRA § 309(c)(5) which effectively rendered them ineligible to apply for suspension of deportation under former section 244 of the INA. Prior to IIRIRA, the time an alien spent in deportation proceedings counted toward the requirement of physical presence in the United States for a continuous period of not less than ten years after becoming deportable or seven years after applying for suspension of deportation. *See Tefel*, 180 F.3d at 1289 & n. 1; INA § 244(a)(2), 8 U.S.C. § 1254(a)(2) (1995).

(1965)); (2) notice of the grounds on which the Government continues to detain him, *see Zadvydas*, 185 F.3d at 297 (holding that deportable alien was entitled to periodic notice of basis for continued detention pending deportation); and (3) an opportunity to present evidence in opposition to the Government's asserted reasons for his detention. *See Castillo–Villagra v. I.N.S.*, 972 F.2d 1017, 1021 (9th Cir.1992) (holding that deportable alien had procedural due process right to present rebuttal evidence in asylum hearing); *Rivera–Cruz v. I.N.S.*, 948 F.2d 962, 968 (5th Cir.1991) (same).

The Court further finds that the Government's presentation of, and the IJ and BIA's reliance on, classified evidence that neither Petitioner nor his counsel were able to review, compromised the fundamental fairness of Petitioner's hearing by denying him notice of the evidence against him and a meaningful opportunity to defend against that evidence. *See Abourezk v. Reagan*, 785 F.2d 1043, 1060–61 (D.C.Cir.1986), *aff'd*, 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987) ("It is a hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment" in order that an alien would not be faced "with a decision against him based on evidence he was never permitted to see and to rebut.")

The Court also finds that the additional failure to maintain any record of the *ex parte in camera* presentation of the classified evidence compounded the deprivation of a fair hearing on Petitioner's bond redetermination by insulating the IJ's decision from meaningful review by the BIA and this Court. *See Marincas v. Lewis*, 92 F.3d 195, 203 (3d Cir.1996) (holding that failure to maintain record of deportable aliens' interviews in asylum hearing violated procedural due process). In view of the fact that the denial of release on bond resulted in Petitioner's continued detention away from his family and community, the Court concludes that Petitioner had a strong interest in having his request for redetermination of his custody status fairly judged. *See Haitian Refugee Center*, 676 F.2d at 1040 (concluding that deportable aliens had constitutionally protected interest in proving entitlement for asylum).

**b. Risk of Erroneous Determination**

The risk of error inherent in the truth-finding process is an additional factor influencing the extent of procedural due process required in bond redetermination proceedings. *See Mathews v. Eldridge*, 424 U.S. at 344, 96 S.Ct. 893; *Haitian Refugee Center*, 676 F.2d at 1040 (finding that "the risk that the INS will make an erroneous asylum determination under the procedures used here is unacceptably high"). Although the "primary consideration in a bail determination is that the parties be able to place the facts as promptly as possible before an impartial arbiter," *Matter of Chirinos*, 16 I & N Dec. 276, 277 (BIA 1977), expeditious procedures should not result in uninformed and unreliable decisions. *See Haitian Refugee Center*, 676 F.2d at 1040 ("When speed was combined with knowingly created scheduling conflicts and unattainable filing deadlines, uninformed and unreliable decisions were almost assured.")

Due to the *ex parte* presentation of the classified information here, a similarly high risk of an erroneous determination regarding Petitioner's custody status may be present. *See Abourezk*, 785 F.2d at 1061 (noting the "firmly held main rule that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions.") The Supreme Court has repeatedly emphasized the importance of the integrity and accuracy of administrative determinations in immigration proceedings. *See Landon*, 459 U.S. at 34, 103 S.Ct. 321 (*citing Mathews v. Eldridge*); *Bridges v. Wixon*, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (noting that signed written statement under oath by witness in deportation hearing "would have afforded protection against mistakes in hearing, mistakes in memory, mistakes

in transcription"); *see also Abourezk,* 785 F.2d at 1061 ("The openness of judicial proceedings serves to preserve both the appearance and reality of fairness in the adjudication of United States Courts.") Indeed, "the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *American–Arab Anti–Discrimination Committee v. Reno,* 70 F.3d 1045, 1069 (9th Cir.1995), *rev'd in part on jurisdictional grounds,* 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

Here, Petitioner and his counsel were not afforded an opportunity to review the classified information presented to the IJ at the *ex parte in camera* portion of the bond redetermination hearing. Nor were they permitted to review a substitution for the classified information in the form of a statement admitting relevant facts that the classified information would tend to prove. *See, e.g.,* Classified Information Procedures Act ("CIPA"), 18 U.S.C.A.App. 3 § 6(c)(1) (providing for alternative procedures for disclosure of classified information). Although IJ McHugh provided Petitioner with a one-line unclassified summary of the classified information, (*see* Petition Exh. F), the Court finds that the summary on its face was insufficient to provide Petitioner with notice of the information underlying the IJ's determination that he was a threat to national security.

As grounds for his determination, the IJ referenced only Petitioner's "association with a terrorist organization known as the Palestinian Islamic Jihad," as demonstrated by classified evidence reviewed *ex parte* and *in camera.* (*See* Petition Exh. A. at 6.) Without an opportunity for Petitioner to confront the information demonstrating his alleged "association," there was no adversarial check on the quality of the information on which the INS relied. *See American–Arab,* 70 F.3d at 1069 (quoting *Knauff,* 338 U.S. at 551, 70 S.Ct. 309 (Jackson, J., dissenting) ("The plea that evidence of guilt must be secret is abhor-

rent to free men because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected.")) The risk of an unreliable determination and an erroneous deprivation of procedural due process rights as a result of the use of classified information in a bond redetermination hearing without an "adversarial check on the quality of the information on which the INS relies" is no less than the risk of error in a deportation proceeding conducted in an *ex parte in camera* manner. *See American–Arab,* 70 F.3d at 1069 (referring to introduction of classified information in an *ex parte in camera* deportation hearing); *see also id.* ("[o]ne would be hard-pressed to design a procedure more likely to result in erroneous deprivations") (quotation omitted). Therefore, the Court finds that the introduction of classified information in an *ex parte in camera* proceeding, without the benefit of an adversarial check on the reliability of that information, posed a substantial risk that the IJ and the BIA could reach an erroneous or unreliable determination that Petitioner should continue to be detained as a threat to national security.

### c. Potential Impact of Additional or Different Procedures

Although not all of the rights of criminal defendants are applicable in the immigration context, *see Carlson,* 342 U.S. at 537, 72 S.Ct. 525, the concept of procedural due process arises more generally from the rights to confrontation and cross-examination, applicable in all judicial proceedings. *See Greene,* 360 U.S. at 496, 79 S.Ct. 1400 (discussing "immutable" principle that "evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.") Because the "foundation of the adversary process assumes that use of undisclosed information will violate due process because of risk of error," *American–Arab,* 70 F.3d at 1069, additional pro-

cedures for the use of classified information in bond redetermination proceedings have a distinct value in minimizing that risk and ensuring the integrity of the result of the proceeding. *See Abourezk,* 785 F.2d at 1060–61 (providing party access to evidence "preserve[s] both the appearance and the reality of fairness in the adjudications of the United States courts.")

### d. Governmental Interests

It is well-settled that the government has an interest in efficient administration of the immigration laws, and in the balancing of interests, it "weigh[s] heavily ... that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon,* 459 U.S. at 34, 103 S.Ct. 321. In accordance with this delegation, "the role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy."[15] *Id.* In addition, present in this case is the governmental interest in protecting national security, an interest that may at times be very compelling. *See Haig v. Agee,* 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (finding that protection of national security and foreign policy "is a governmental interest of great importance"); *Snepp v. United States,* 444 U.S. 507, 509 n. 3, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) ("The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service."); *see also Carlson,* 342 U.S. at 538, 72 S.Ct. 525 (noting importance of detention during deportation proceedings to prevent aliens from injuring United States in the interim). These governmental interests remain

undisputed, but the issue is whether these interests justify denial of procedural due process protections to Petitioner in continuing to detain him pending resolution of his deportation proceedings. *See Haig,* 453 U.S. at 310, 101 S.Ct. 2766 (balancing citizen's procedural due process rights with national security interests); *Rafeedie v. I.N.S.,* 795 F.Supp. 13, 19 (D.D.C.1992) (balancing permanent resident alien's procedural due process rights with government's national security interests).

In addition to the immigration and national security interests, however, the government also has an interest in the integrity and accuracy of administrative proceedings in which those interests are furthered. *See Bridges,* 326 U.S. at 153, 65 S.Ct. 1443 (finding that rules governing immigration proceedings "are designed as safeguards against essentially unfair procedures."); *Abourezk,* 785 F.2d at 1060 (describing governmental interest in preserving fairness in judicial proceedings).

Balancing the government's interests with Petitioner's interests in the context of Petitioner's bond redetermination proceeding, the Court finds that Petitioner's procedural due process rights have been violated insofar as the introduction of and reliance on classified information deprived him of his right to a fundamentally fair hearing to determine his eligibility for release from custody during the pendency of his deportation proceedings. *See American–Arab,* 70 F.3d at 1070 (holding that government's use of undisclosed classified information violated deportable aliens' due process rights); *Haitian Refugee Center,* 676 F.2d at 1040 (holding that government conducted asylum proceedings in fundamentally unfair manner as to violate deportable aliens' due process rights); *Matter of Velasquez,* 19 I & N Dec. 377, 380 (BIA 1986) (holding that evidence consid-

---

**15.** The Court notes that the House of Representatives is currently considering a bill that would repeal the ATRC provisions and prohibit the introduction and use of classified national security information in immigration proceedings. *See* Secret Evidence Repeal Act of 1999, H.R.2121, 106th Cong. (1999).

ered by BIA in deportation proceedings must be "probative and its use fundamentally fair, so as not to deprive an alien of due process of law"); *see also Haig,* 453 U.S. at 310, 101 S.Ct. 2766 (holding that statement of reasons for revocation of American citizen's passport and prompt post-revocation hearing comported with procedural due process guarantees). Specifically, the manner in which the IJ conducted Petitioner's bond redetermination proceedings deprived Petitioner of his rights: (1) to notice of the evidence presented in opposition to his release from detention; (2) an opportunity to confront and rebut that evidence; and (3) a fundamentally fair hearing of his application for redetermination of his custody status.[16]

### Appropriate Remedy

■ Having determined that the manner in which the IJ and BIA conducted Petitioner's bond redetermination proceedings violated his right to procedural due process, the Court must now determine the appropriate remedy. These procedural due process violations described above impermissibly tainted Petitioner's bond redetermination proceedings. Thus, the precise injury here is to Petitioner's constitutionally protected right to have his application for release from custody pending his deportation proceedings fairly judged. Accordingly, the remedy for that injury is to afford Petitioner the opportunity for his application to be considered by the IJ in a fundamentally fair manner on remand. *See Arauz v. Rivkind,* 845 F.2d 271, 276 (11th Cir.1988) (affirming district court's order remanding to INS to consider asylum application in fundamentally fair manner); *Castro–O'Ryan v. U.S. I.N.S.,* 847 F.2d 1307, 1314 (9th Cir.1987) (remanding for reconsideration of asylum application in fundamentally fair hearing).

As explained by Judge Friendly, among the most important attributes of a fair hearing are: (1) notice of the proposed action and the grounds on which it is asserted; (2) the right to know the evidence presented against the individual; (3) a decision based solely on the evidence presented; and (4) a proceeding open to the public. *See* Henry J. Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1275 (1975); *see also Mathews v. Eldridge,* 424 U.S. at 348, 96 S.Ct. 893 ("The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'") (*quoting Joint Anti–Fascist Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). In revisiting Petitioner's application for redetermination of his custody status, the IJ must balance these procedures against the government's interests in detaining Petitioner pending resolution of his deportation proceedings and protecting classified information from unnecessary disclosure. *See American–Arab,* 525 U.S. at 490, 119 S.Ct. at 947 (noting tension between aliens' interests and government's interests in preventing disclosure of classified information while putting "an end to an ongoing violation of United States law.")

### a. Determination Based Solely on Public Record

The first step in achieving this balance is a determination by the IJ whether, based solely on the evidence presented at the public portions of the bond redetermination proceedings held on May 29, 1997 and June 6, 1997, there are facially legitimate and bona fide reasons to conclude that Petitioner is a threat to national security. *See Azzouka v. Meese,* 820 F.2d 585, 587 (2d Cir.1987) (per curiam) (determining that public record alone, apart from classified information, contained sufficient evi-

---

**16.** Because the Court has not reviewed the classified information and because the Court finds Petitioner's procedural due process rights were violated on these three grounds, the Court does not reach Petitioner's challenge to the use of hearsay evidence at the *ex parte in camera* portion of the bond redetermination hearing.

dence to justify finding that alien was threat to national security). The IJ is in the best position to make such a factual determination.[17] *See id.* (noting that court had remanded to agency for finding on factual issue of threat to national security); *Flynn v. Shultz*, 748 F.2d 1186, 1194 (7th Cir.1984) (remanding to agency for factual determination). The Court finds that the IJ may in fact be able to make this determination, in conformity with procedural due process, based on the complete record of the public portions of Petitioner's prior bond redetermination hearings, without further hearing. *See Arauz*, 845 F.2d at 276 (explaining that full evidentiary hearing on remand was not required as long as alien was afforded "some meaningful opportunity to be heard, followed by the [IJ's] careful consideration of the weight to be given such evidence"); *United States v. Franz*, 818 F.Supp. 1478, 1483 (M.D.Fla. 1993) (finding *de novo* hearing on remand unnecessary where record of prior administrative hearing was complete and sufficient to make factual determination). Upon a finding that the public record evidence in fact supports the conclusion that Petitioner is a threat to national security, the IJ's inquiry is at an end.

### b. Procedures for Use of Classified Information

If the IJ determines the public record insufficient to conclude that Petitioner must be detained as a national security threat, only then should the Government present, if it wishes, classified information in support of its argument for continued detention. In such a situation, the Government should not be entirely precluded from relying on classified information, but must introduce it in a manner that affords Petitioner "access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests." *Abourezk*, 785 F.2d at 1060; *see Haitian Refugee Center*, 676

F.2d at 1039 & n. 41 (giving government opportunity to submit proposed plan for processing Haitian aliens' asylum applications in conformity with due process).

At the public portion of the bond redetermination hearing, the IJ did make efforts to ensure that "all appropriate safeguards were employed to minimize [Petitioner's] disadvantage of not being able to examine the classified evidence," (BIA Bond Redetermination Decision, at 9), such as providing an unclassified summary of the classified evidence and re-opening the hearing to permit Petitioner to present additional rebuttal witnesses. These efforts, however, did not reach far enough to remedy the fundamental deprivations of due process Petitioner sustained as a result of his inability to know and confront the evidence against him. *See Greene*, 360 U.S. at 496, 79 S.Ct. 1400 (emphasizing importance of disclosure of evidence to individual "so that he has an opportunity to show that it is untrue.") For example, the one-sentence description of Petitioner's "association" with the Palestinian Islamic Jihad and the opportunity to present witnesses who could only testify in the abstract in rebuttal to these allegations did not vitiate the fact that the unclassified summary lacks detail to bolster the credibility of its content and the necessity of its use against Petitioner. *See Kiareldeen*, 71 F.Supp.2d at 413 (criticizing lack of substance in unclassified summary of classified information used in deportable alien's bond redetermination proceedings).

Two statutory schemes suggest procedures that may assist the IJ in conducting a proceeding involving classified evidence that properly balances Petitioner's procedural due process rights and the government's interests in national security and the fair and efficient administration of the

---

**17.** No transcript of the public portion of Petitioner's bond redetermination proceeding was made and the parties have not provided the Court with a tape recording or other record of that hearing.

immigration laws.[18] Congress established a statutory scheme for the introduction of classified evidence in criminal proceedings in CIPA, 18 U.S.C.A.App. 3 §§ 1–16, and, subsequent to the initiation of Petitioner's deportation proceedings, established a statutory scheme for the use of classified evidence in deportation proceedings in the ATRC procedures. *See* 8 U.S.C.A. §§ 1531 *et seq.* Neither CIPA nor the ATRC procedures apply in the context of Petitioner's bond redetermination proceedings: CIPA because it applies only to criminal proceedings, *see United States v. Koreh*, 144 F.R.D. 218, 223 (D.N.J.1992) (holding that CIPA did not apply to denaturalization proceedings which were civil in nature); and the ATRC provisions because they apply only to determine the deportability of alien terrorists. *See* Part III.B.2, *supra.*

The procedures in CIPA and the ATRC do provide guidance, however, for the IJ to establish procedures for the introduction of classified information in Petitioner's bond redetermination hearings, following the requisite findings based on the public evidence, that will preserve Petitioner's rights to notice, an opportunity to confront the evidence, and a fundamentally fair proceeding, that are the essence of procedural due process. *See Mathews v. Eldridge*, 424 U.S. at 348, 96 S.Ct. 893. For example, CIPA requires a record of all proceedings, including *ex parte in camera* proceedings, *see* 18 U.S.C.A.App. 3 §§ 4, 6(a), 6(d), and provides the option of substituting a stipulation of the facts the classified evidence would tend to prove. *See* 18 U.S.C.A.App. 3 § 6(c). In addition, the ATRC procedures provide alien terrorists access to counsel with security clearance to represent them in deportation proceedings. *See* 8 U.S.C.A. § 1532(e).[19]

Following the guidance of CIPA or the ATRC does not, however, require the Government to disclose the classified information to Petitioner. *See C.I.A. v. Sims*, 471 U.S. 159, 180, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985) (holding that courts may not themselves order declassification and disclosure of classified national security information). To the contrary, the Court's recognition of the government's interests in combating terrorism and protecting national security underscore the Court's conclusion that classified information should not be abused, but should be invoked only upon an allegation that the alien poses a threat to national security and a finding that the record evidence is insufficient to justify such detention. *See American–Arab*, 70 F.3d at 1070 ("Only the most extraordinary circumstances could support one-sided process."); *Abourezk*, 785 F.2d at 1061 (noting "the firmly held main rule that a court may not dispose of the merits of a case on the basis of ex parte, in camera submissions").[20] A prerequisite, independent finding, on the basis of the record evidence alone, shall serve to reduce the risks of: (1) unnecessary disclosure of classified information; (2) deprivation of an alien's right to procedural due process; and (3) an erroneous administrative determination contrary to fundamen-

---

**18.** In addition, the Court notes that the Attorney General is, at present, "working on guidelines and regulations to regularize and improve" practices and procedures designed "to ensure that classified evidence is used only when necessary to serve the national interest." *See Hearing on H.R. 2121 Before the House Judiciary Subcommittee on Immigration*, 106th Cong. (Feb. 10, 2000) (prepared testimony of Larry R. Parkinson, General Counsel, FBI) ("Parkinson Testimony").

**19.** Among the proposed amendments to the ATRC procedures, the Secret Evidence Repeal Act of 1999 would "[e]ntitle an alien subject

to arrest and detention for removal or deportation to ... Government-provided counsel and access to all evidence." H.R. 2121, 106th Cong. § 6 (1999).

**20.** *See also* Parkinson Testimony, *supra* note 18 (explaining that "[b]efore any final decision is made to use classified information in immigration proceedings, the information and the case are subjected to rigorous review at high levels of all affected Justice Department components to ensure that it is necessary and appropriate to use the information").

tal fairness. *See Molerio v. F.B.I.*, 749 F.2d 815, 821 (D.C.Cir.1984) (balancing government's and individual's interests to allow introduction of classified information only upon prerequisite finding of necessity).

### D. Petitioner's Detention Based on His "Association" with PIJ.

Petitioner also claims that his detention based on his "association" with the PIJ violated the INA and the First Amendment. Although Respondents do not address Petitioner's statutory arguments, they do argue that the First Amendment does not preclude the use of classified information in Petitioner's bond redetermination proceedings. (*See* Resp. Answer at 46.) In view of the Court's decision to remand this matter to the INS for further proceedings it is necessary to clarify the limits on the Attorney General's ability to detain an alien as "a threat to national security."

### 1. INA

The IJ determined that Petitioner was a threat to national security, and therefore ineligible for release on bond "[s]pecifically because of his association with the Palestinian Islamic Jihad terrorist organization." (IJ's Bond Redetermination Decision at 6.) Therefore, the issue is whether, under the INA, a deportable alien's mere "association" with a known terrorist organization, is reasonable grounds to conclude that he is a threat to national security and that he should therefore continue to be detained during the pendency of deportation proceedings.

No authority has been cited to the Court discussing what facts and circumstances suffice, in bond redetermination proceedings, to demonstrate that an alien is a threat to national security based on his "association" with a known terrorist organization, specifically here the PIJ. In the deportation context, however, the Supreme Court has addressed the extent of "association" that must be shown to deport an alien based on his membership in or affiliation with the Communist Party pursuant to section 22 of the Internal Security Act of 1950, and INA § 241(a)(6)(c), 8 U.S.C.A. § 1251(a)(6)(C) (West 1952). *See Rowoldt v. Perfetto*, 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957); *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954).[21] The Court has interpreted "membership" to mean "more than the mere voluntary listing of a person's name on the Party rolls," *Scales v. United States*, 367 U.S. 203, 222, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). This interpretation recognized that "there is a great practical and legal difference between those who firmly attach themselves" to the beliefs of an organization "being aware of all of the aims and purposes attributed to it," and those who temporarily join an organization unaware "of its international relationship and believing it to be a group solely trying to remedy unsatisfactory social or economic conditions, carry out trade-union objectives, eliminate racial discrimination, combat unemployment, or alleviate distress and poverty." *Gastelum–Quinones v. Kennedy*, 374 U.S. 469, 472–73, 83 S.Ct. 1819, 10 L.Ed.2d 1013 (1963). Therefore, under the INA, in order to be deportable based on "membership" or "affiliation" with the Communist Party, the evidence must have shown the alien's "meaningful association" with and awareness of the "distinct and active political nature" of the Party. *Id.* at 473, 83 S.Ct. 1819 (citing

---

**21.** Section 22 of the Internal Security Act ("ISA") provided that the Attorney General shall take into custody and deport any alien "who was at the time of entering the United States, or has been at any time thereafter, ... a member of any one of the classes of aliens enumerated in section 1(2) of this Act." ISA §§ 1, 22, 64 Stat. 987, 1006, 1008 (1950).

Section 1(2)(C) of the ISA listed "[a]liens who are members of or affiliated with (i) the Communist Party of the United States...." *Id.* This provision was incorporated into INA § 241(a)(6)(c), 8 U.S.C.A. § 1251(a)(6)(c). *See Rowoldt*, 355 U.S. at 117 n. 1, 78 S.Ct. 180; *Galvan*, 347 U.S. at 525 n. 2, 74 S.Ct. 737.

*Rowoldt,* 355 U.S. at 120, 78 S.Ct. 180 and *Galvan,* 347 U.S. at 528, 74 S.Ct. 737); *see also Bridges,* 326 U.S. at 144, 65 S.Ct. 1443 (holding "course of conduct which reveals cooperation with Communist groups for the attainment of wholly lawful objectives" did not constitute "affiliation" as defined by INA).

The juxtaposition of the evidence presented in *Galvan* with the evidence presented in *Rowoldt* provides further definition to the concept of "association" as used in the Internal Security Act and the INA. In *Galvan,* the INS presented two sources of evidence of the alien's membership in the Communist Party: (1) the alien's own testimony during interrogation by the INS; and (2) the testimony of a woman who had been present when the alien was elected an officer of the Spanish Speaking Club, an alleged unit of the Communist Party. *See Galvan,* 347 U.S. at 524, 74 S.Ct. 737. In defense against his deportation, the alien argued that he did not join the Communist Party, and that if he did join, he was unaware of the Party's true purposes and program. *Id.* at 528, 74 S.Ct. 737. As summarized by the Court, the evidence on which the INS Hearing Officer based his finding that the alien was a "member" in the Communist Party showed that: (1) the alien was asked to join the Party by a person he assumed to be an organizer; (2) the alien attended a number of meetings; (3) the alien did not apply for United States citizenship because he feared his Party membership would become known to the authorities; and (4) the alien was active in and an officer of the Spanish Speaking Club. *Id.* at 529, 74 S.Ct. 737. Based on this evidence, the Court concluded that there was a reasonable foundation for the finding that the alien was a member of the Communist Party, and that, even if the alien was unaware of the Party's advocacy of violence, the evidence "[did] not show a relationship to the Party so nominal as not to make him a 'member' within the terms of the Act." *Id.*

In contrast, the evidence presented in *Rowoldt* consisted solely of Rowoldt's own testimony that he had previously been a member of the Communist Party for a period of less than one year. *See* 355 U.S. at 116, 78 S.Ct. 180. Although he had worked as a salesman in a Communist Party bookstore during that time, Rowoldt stated that his purpose in joining the Party was motivated by his need to fight to obtain food and a job. *Id.* at 117, 78 S.Ct. 180 ("The purpose was probably this—it seemed to me that it came hand in hand— the Communist Party and the fight for bread ... [T]he Communist Party and the Workers' Alliance had one aim—to get something to eat for the people.") Noting that "[t]he differences on the facts between [*Galvan* ] and this case [were] too obvious to be detailed," the Court stated:

> we cannot say that the unchallenged account given by [Rowoldt] of his relations to the Communist Party establishes the kind of meaningful association required by [the INA] ... From his own testimony in 1947, which is all there is, the dominating impulse to his "affiliation" with the Communist Party may well have been wholly devoid of any "political" implications.

355 U.S. at 120–21, 78 S.Ct. 180. *See also Grzymala–Siedlecki v. United States,* 285 F.2d 836, 840 (5th Cir.1961) (holding that alien's own testimony established that his "affiliation" with Communist Party was devoid of "political" implications and therefore insufficient to establish "meaningful association" required for deportability under Internal Security Act).

Instructed by the Supreme Court's interpretation of the concept of "meaningful association" under the INA, this Court finds that mere "association" with a known terrorist organization such as the PIJ does not constitute a reasonable foundation under the INA for the conclusion that Petitioner was a threat to national security and therefore would not be released from INS custody on bond. While the INA permits the Attorney General to detain an alien as a threat to national security, the statute,

as interpreted by the Supreme Court, requires that the evidence supporting that decision show more than "unexplained membership" and show a "degree of participation" in the activities of the organization that poses a threat to national security. *See Carlson,* 342 U.S. at 541, 72 S.Ct. 525. Therefore, Petitioner's mere "association" with the PIJ is not a reasonable foundation for the IJ's decision to deny bond and continue to detain Petitioner as a threat to national security. *See id.* (holding bond redetermination decision may only be overridden "where it is clearly shown that it 'was without a reasonable foundation.'") (internal citation omitted).

On remand, therefore, when evaluating the public record evidence, and/or any classified information presented consistent with this Order, the IJ must determine whether the evidence demonstrates more than mere "membership" or "association," but rather "meaningful association" or a "degree of participation" in activities posing a threat to national security. *See Gastelum–Quinones,* 374 U.S. at 476–77, 83 S.Ct. 1819 (holding that evidence was "extremely insubstantial in demonstrating the 'meaningful' character of [the alien's] association with the Party, either directly, by showing that he was, during the time of his membership, sensible to the Party's nature as a political organization, or indirectly, by showing that he engaged in Party activities to a degree substantially supporting an inference of his awareness of the Party's political aspect"); *Rowoldt,* 355 U.S. at 121, 78 S.Ct. 180 (holding that record was "too insubstantial" to demonstrate "meaningful association" required by INA for deportation); *Diaz v. Barber,* 261 F.2d 300, 301 (9th Cir.1958) (holding that evidence of alien's past "connections" with Communist Party did not demonstrate "meaningful association" under INA).

### 2. First Amendment

Petitioner also argues that the IJ's decision to deny his release on bond as a threat to national security based on his "association" with the PIJ violates the First Amendment. (*See* Pet.Mem. in Support at 33–37.) Having found that the IJ's conclusion that Petitioner is a threat to national security based on his "association" with the PIJ lacks a reasonable foundation under the INA, however, the Court need not reach the First Amendment issues raised by Petitioner. *See Bridges,* 326 U.S. at 156–57, 65 S.Ct. 1443 (declining to reach constitutional issues where evidence was insufficient to demonstrate "affiliation" required by statute).

### VI. Conclusion

Having concluded that Petitioner possessed a constitutionally protected interest in applying for a redetermination of his custody status and having that application fairly judged, and that the procedures followed at Petitioner's bond redetermination proceedings were not fundamentally fair, the Court has fashioned a remedy for the injury to Petitioner's procedural due process rights by vacating the bond redetermination decisions of the IJ and of the BIA and remanding this matter to the INS for further proceedings consistent with this Order. The Court intends this remedy to strike the proper balance between Petitioner's procedural due process rights and the Government's interests "by adopting procedures that reduce the risk of erroneous deprivation without imposing an undue burden on the government." *Walters,* 145 F.3d at 1043–44.

Accordingly, it is

**ORDERED AND ADJUDGED** that:

(1) The Petition for Writ of Habeas Corpus, filed December 22, 1999, is **GRANTED IN PART** to the extent that the Bond Redetermination Decisions of the Immigration Judge, dated June 23, 1997, and of the Board of Immigration Appeals, dated September 15, 1998, are **VACATED** and this matter is **REMANDED** to the Immigration and Naturalization Service for further proceedings consistent with this opinion. The Petition is **DENIED IN PART** to the extent that Petitioner shall remain in the

custody of Respondents pending a redetermination of Petitioner's custody status by the Immigration Judge.

(2) Respondents' Motion to Dismiss, filed February 1, 2000 is **DENIED.**

(3) Petitioner's Motion to Strike, filed February 25, 2000 is **DENIED.**

(4) The Clerk of the Court is DIRECTED to CLOSE this case forthwith.